## IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DANNY YELTON, as Special** | ) | |
| **Administrator of the Estate of LESLEY** | ) | |
| **SARA HENDRIX a/k/a LESLEY** | ) | |
| **SARA YELTON, deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. CIV-21-1001-G** |
| **v.** | ) | |
| | ) | |
| **BOARD OF COUNTY COMMISSIONERS** | ) | |
| **OF CANADIAN COUNTY, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff filed this action under 42 U.S.C. § 1983 alleging civil rights violations. (Doc. 26).  United States District Judge Charles Goodwin referred the matter to United States Magistrate Judge Gary M. Purcell for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C).  (Doc. 25, at 6).  It was subsequently transferred to the undersigned Magistrate Judge.  (Doc. 44).

Before the court is Defendant Turn Key Health Clinic, LLC's ("Turn Key's") Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 30).  Plaintiff has filed a Response to the Motion (Doc. 38), and Defendant Turn Key filed a Reply (Doc. 40).  For the reasons set forth fully below, the undersigned recommends that Defendant Turn Key's Motion to Dismiss be **GRANTED** and that all claims against Defendant Turn Key be **DISMISSED.**

## I.      Plaintiff's Second Amended Complaint

On August 2, 2023, Plaintiff, husband of Lesley Sara Hendrix and special administrator of her estate, filed a Second Amended Complaint asserting multiple claims arising from the circumstances surrounding Ms. Hendrix's death during her confinement as a pre-trial detainee at the Canadian County Detention Center ("CCDC").  (Doc. 26). Plaintiff named as Defendants the Board of County Commissioners of Canadian County (the "Board"); Sheriff Chris West, in his individual and official capacities; the Canadian County Sheriff's Office; CCDC Jail Administrator Kristie Carter, in her individual and official capacities; Turn Key; and John Does 1-10.  (*Id.* at 2-3).  Defendant Turn Key is a third-party contractor that is responsible for providing medical services to those in custody at CCDC.  (*Id.* at 2).

In the Second Amended Complaint, Plaintiff sets forth the following allegations. Ms. Hendrix began her confinement as a pre-trial detainee at CCDC in January 2016.  (*Id.* at 4).  While incarcerated, Ms. Hendrix was responsible for purchasing body soap and feminine hygiene products, and she reported her access to showering, sanitary products, and cleaning supplies was limited.  (*Id.*)  Ms. Hendrix developed severe anxiety for which she was prescribed medication.  (*Id.* at 5).  A registered nurse employed by Defendant Turn Key distributed medications on a daily basis. (*Id.*)

During the first week of October 2020, Ms. Hendrix developed a rash on her legs. (*Id.*)  She reported this rash to Turn Key and/or CCDC personnel but received no treatment. (*Id.*)  On or near October 4, 2020, Ms. Hendrix told her mother, Barbara Gallagher ("Gallagher"), and Plaintiff during visits that she was experiencing nausea, severe pain,

dizziness, and vomiting.  (*Id.*)  Ms. Hendrix requested of CCDC officers and/or Turn Key employees, including the nurse who delivered her daily anxiety medication, to see medical staff.  (*Id.*)  Turn Key employees and/or CCDC officers told Ms. Hendrix that she must make an appointment at the computer kiosk to receive treatment, but the kiosk was broken. (*Id.*)  When medications were distributed, Ms. Hendrix informed the RN, a tech, and a CCDC officer that the kiosk was broken and that she needed medical care.  (*Id.* at 6).  A CCDC officer told Ms. Hendrix that he would provide her a written request form for medical treatment but never did so.  (*Id.*)  Turn Key's records indicate it provided no medical services or treatments to Ms. Hendrix in the month preceding her death. (*Id.* at 5).

On October 10, 2020, Plaintiff spoke via video call with Ms. Hendrix, who stated that she felt like she "was dying."  (*Id.* at 6).  Plaintiff observed that Ms. Hendrix was incoherent, had difficulty standing, and was acting erratically.  (*Id.*)  On the same date, Gallagher had a video conference with Ms. Hendrix during which Gallagher observed that Ms. Hendrix looked very ill and had difficulty standing up. (*Id.*)  Immediately following the video conference, Gallagher telephoned CCDC to report that Ms. Hendrix needed immediate medical attention.  (*Id.*)  Upon information and belief, neither CCDC nor Turn Key employees responded to this report.  (*Id.*)

On October 11, 2020, Hendrix collapsed and was found "down."  (*Id.* at 7). Defendant Turn Key and/or CCDC arranged for Ms. Hendrix to be transported to the local hospital.  (*Id.*)  Upon arrival, Ms. Hendrix was in critical condition, experiencing acute respiratory distress, metabolic acidosis, and severe septic shock.  (*Id.*)  Medical staff noticed a strong odor and discovered the smell was emanating from an enormous black,

bulging wound to her perineum, lower abdomen, buttocks, and genitals. (*Id.*) The sepsis and wound were caused by necrotizing fasciitis, commonly referred to as "flesh eating bacteria." (*Id.*) All emergency and surgical interventions were unsuccessful, and Ms. Hendrix died the following morning on October 12, 2020, in the hospital's intensive care unit. (*Id.*)

In January 2020, ten months before Ms. Hendrix died, Ms. Hendrix's aunt recorded a telephone conversation between herself and Defendant Sheriff West. (*Id.* at 8). During that conversation, Defendant Sheriff West stated, *inter alia*, that Defendant Carter, the Jail Administrator, runs CCDC and he had given her "carte blanche" responsibility to operate CCDC. (*Id.*) However, he later acknowledged that he was ultimately responsible for CCDC because he was getting sued repeatedly. (*Id.*) Defendant Sheriff West suggested Ms. Hendrix was lying about her living conditions and refused to discuss the uncleanliness of the jail cells, but he admitted that female inmates were locked in their cells 23 out of 24 hours each day. (*Id.* at 8-9).

Following Ms. Hendrix's death, Plaintiff initiated the current lawsuit on behalf of her estate. (Doc. 1). Plaintiff asserts the following claims against Defendant Turn Key under 42 U.S.C. § 1983:

- deliberate indifference to serious medical needs in violation of the Fourteenth Amendment (First Cause of Action) (Doc. 26, at 9-11);
- deprivation of substantive due process in violation of the Fourteenth Amendment (Second Cause of Action) (*id*. at 11-13); and
- municipal liability for deliberate indifference to serious medical needs (Sixth Cause of Action) (*id*. at 16-17).

Additionally, Plaintiff asserts the following claims against Defendant Turn Key under

4

Oklahoma law:

- violations of Article II, Sections 7 and 9 of the Oklahoma Constitution[1] (Third Cause of Action) (*id*. at 13-14); and
- gross negligence and intentional infliction of emotional distress asserted against Turn Key employees under the Oklahoma Governmental Tort Claims Act ("OGTCA") (Fourth Cause of Action) (*id*. at 14-15).

In Defendant Turn Key's Motion to Dismiss, it argues that Plaintiff has failed to state a plausible claim under 42 U.S.C. § 1983, that Oklahoma does not recognize a cause of action arising from the Oklahoma Constitution based on denial of medical care, and that it is immune from liability against Plaintiff's remaining state law claims. (Doc. 30).

## II.     Standard of Review

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991) (emphasis added). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at

---

[1] The Oklahoma Constitution, Article II, Section 7 states: "No person shall be deprived of life, liberty, or property, without due process of law." Section 9 states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."

556); *see also Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010). In applying this standard, the court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"Plausible" in this context does not mean "likely to be true," but rather refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct," then the plaintiff has not "nudged (his) claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility requirement "serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id*. at 1248.

## III. Plaintiff's Claims of Deliberate Indifference to Ms. Hendrix's Serious Medical Needs Should Be Dismissed for Failure to State a Claim.

Section 1983 "creates a private right of action against any person who, under color of state law, deprives another individual of 'any rights, privileges or immunities secured by the Constitution and laws.'" *Ripley v. Wyo. Med. Ctr., Inc.*, 559 F.3d 1119, 1121-22 (10th Cir. 2009) (quoting 42 U.S.C. § 1983). A private entity acting under color of state law may be held liable for constitutional violations under § 1983. *Dubbs v. Head Start,*

*Inc.*, 3363 F.3d 1194, 1216 (10th Cir. 2003).  As a provider of medical services at state correctional facilities, including CCDC, Defendant Turn Key is subject to § 1983 liability under the *Monell* doctrine of municipal liability.  *Id.* ("Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, caselaw from this and other circuits has extended the *Monell* doctrine to private § 1983 defendants."); *see Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691-92 (1978); *see, e.g., Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127 (10th Cir. 2023) (resolving a municipal liability claim against Turn Key).

Under the *Monell* doctrine, Defendant Turn Key cannot be held vicariously liable for its employees' alleged constitutional violations under § 1983.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  Instead, to establish Defendant Turn Key's liability under § 1983, Plaintiff must establish three basic elements: (1) Defendant Turn Key had an official policy or custom; (2) that caused a violation of Plaintiff's constitutional rights; and (3) that "was enacted or maintained with deliberate indifference to an almost inevitable" constitutional rights violation.  *Id*. at 769-71.  As explained fully below, the undersigned finds that Plaintiff has failed to sufficiently allege that Defendant Turn Key had an official policy, custom, or failure to train or supervise in order to impose municipal liability.  However, even if Plaintiff had satisfied this crucial requirement, the undersigned further finds that Plaintiff has failed to sufficiently allege a constitutional violation attributable to Defendant Turn Key.

**A.      Plaintiff Has Failed to Plausibly Allege a Turn Key Policy or Custom.**

In applying the *Monell* doctrine, the Tenth Circuit has articulated that a policy or

custom may take one of five forms:

> (1) a formal regulation or policy statement; (2) an informal custom
> amounting to a widespread practice that, although not authorized by written
> law or express municipal policy, is so permanent and well settled as to
> constitute a custom or usage with the force of law; (3) the decisions of
> employees with final policymaking authority; (4) the ratification by such
> final policymakers of the decisions — and the basis for them — of
> subordinates to whom authority was delegated subject to these policymakers'
> review and approval; or (5) the failure to adequately train or supervise
> employees, so long as that failure results from deliberate indifference to the
> injuries that may be caused.

*Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v.*

*City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

In the First Cause of Action, Plaintiff alleges that:

52.      Hendrix's constitutional rights were violated due to the policy or
         custom of the Defendant, the Sheriff of Canadian County, and/or the
         Board of Commissioners including but not limited to:

         a.      A custom or policy of providing inadequate medical care;
         b.      A custom or policy of failing to properly assess patients for
                 serious medical needs;
         c.      A custom or policy of failing to provide any medical care;
         d.      A custom or policy of failing to properly train employees in the
                 provisions of medical care;
         e.      A custom or policy of failing to supervise patients that
                 demonstrate serious medical conditions and/or needs;
         f.      A custom or policy of failing to respond to emergent needs due
                 to contracts associated with the provision of medical care to
                 detainees or inmates;
         g.      A custom or policy of improperly delegating the medical care
                 of inmates to others that are not properly qualified to provide
                 constitutionally sufficient medical care;
         h.      A custom or policy of failing to have adequate guidelines for
                 standards of medical care;

  i. A custom or policy of not staffing the detention center with sufficient properly qualified staff to manage, monitor, or treat the conditions of inmates with complex or serious mental health or physical needs;

  j. A custom or policy of severely limiting the use of off-site medical and diagnostic service providers even in emergent situations in disregard to known, obvious, or excessive risks to the health and safety of detainees and/or inmates;

  k. Further customs or policies that resulted in the violation of Hendrix's rights.

. . .

56. The actions of the Defendants and their employees were taken pursuant to the policies or customs of the Defendants set forth, and therefore, Defendants shall be liable to Plaintiff for the violation of Hendrix's rights.

(Doc. 26, at 10-11).

In his Sixth Cause of Action, Plaintiff alleges:

89. Turn Key is charged with implementing and assisting in developing the policies of Sheriff West/Canadian County Sheriff Office with respect to the medical and mental health care of detainees at the Canadian County Detention Center and have shared responsibility to adequately train and supervise its employees.

90. There is an affirmative causal link between the acts and/or omissions described above in being deliberately indifferent to Plaintiff's [sic] serious medical needs, health, and safety and violating Plaintiff's [sic] civil rights and the customs, policies, and/or practices carried out by Turn Key.

91. Turn Key knew or should have known that these policies, practices and/or customs posed substantial risks to the health and safety of detainees like Plaintiff [sic]. Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks in deliberate indifference to detainees, including Plaintiff's [sic], serious medical needs.

92. Turn Key tacitly encouraged, ratified and/or approved of the acts and/or omissions alleged herein.

93. There is an affirmative casual [sic] link between the customs, policies

9

> and/or practices and Plaintiff's [sic] injury and damages alleged
> herein.

(*Id.* at 16-17).[2]

Plaintiff does not allege any facts indicating Defendant Turn Key had a formal written policy that caused a violation of Ms. Hendrix's constitutional rights; nor does Plaintiff allege that a specific final policymaker of Defendant Turn Key made or ratified a decision that caused a violation of Ms. Hendrix's constitutional rights. Thus, the court need only determine whether Plaintiff has stated a municipal liability claim for deliberate indifference to serious medical needs through an informal custom theory or a failure to train and supervise theory. (*See* Doc. 26, at 9-11, 16-17).

### 1.    Informal Custom

To establish municipal liability through an informal custom or practice, a plaintiff must show that a "continuing, persistent and widespread practice of unconstitutional misconduct" caused the injury, and policymaking officials on notice of the misconduct showed deliberate indifference or "tacit approval" of the misconduct. *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cnty.*, 996 F.2d 1035, 1041 (10th Cir. 1993). "In attempting

---

[2] Plaintiff's First Cause of Action, stated against "all Defendants," and Sixth Cause of Action, stated Against Defendant Turn Key alone, both assert claims of deliberate indifference to Ms. Hendrix's serious medical needs and thus are redundant of each other as to Defendant Turn Key. Furthermore, it appears that the custom and policy allegations in the First Cause of Action at Paragraph 52, *see supra*, are stated against Defendant Sheriff West and the Defendant Board alone. However, it appears that the Sixth Cause of Action, *see supra*, attempts to incorporate the custom and policy allegations of Paragraph 52 and/or to implicate Defendant Turn Key in the development and maintenance of such customs and policies. Accordingly, the undersigned analyzes Defendant Turn Key's liability with reference to the allegations in both the First and Sixth Causes of Action.

to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).  Similar conduct performed by multiple employees does not amount to a practice or custom if the conduct was only directed toward one person. *See Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (granting summary judgment for defendant where plaintiff only alleged incidences of discrimination directed against herself).  "A 'single isolated incident' does not prove the existence of an unconstitutional policy or custom." *McClain v. Sheriff of Mayes Cnty.*, 595 F. App'x 748, 754 (10th Cir. 2014).

Though Plaintiff alleges in the Second Amended Complaint that Turn Key employees failed to provide Ms. Hendrix with adequate medical care over the course of multiple days, (Doc. 26, at 5-6), Plaintiff does not allege facts suggesting that such conduct was widespread throughout CCDC or any other institution in which Defendant Turn Key provides medical services to inmates.  In Plaintiff's Response to Defendant Turn Key's Motion to Dismiss, Plaintiff alleges that "Turn Key has a lengthy history of mistreating and abusing jail inmates" and gives three examples discussed in a news article.  (Doc. 38, at 24).  However, "[w]hen ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint" and "cannot review matters outside of the complaint." *Jackson v. Integra Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991); *see also Miller*, 948 F.2d at 1565 (on a motion to dismiss, the court assesses "plaintiff's complaint alone"); *McDonald v. Citibank N.A.*, 2021 WL 5736437, at *9 (D. Colo. Dec. 2, 2021) ("A plaintiff [ ] may not

amend his complaint in a response to a defendant's motion to dismiss."); *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) ("The plaintiffs may not effectively amend their Complaint by alleging new facts in their response to a motion to dismiss.").  Without facts in the Second Amended Complaint plausibly alleging that individuals similarly situated to Ms. Hendrix have been treated comparably to her, Plaintiff's assertions regarding the existence of various Turn Key policies and customs are merely conclusory, and thus insufficient to show an entitlement to relief.  *See Ashcroft*, 556 U.S. at 678.  Therefore, Plaintiff has not stated a municipal liability claim against Defendant Turn Key through informal custom.

### 2.     Failure to Train and Supervise

As the court considers municipal liability under a failure to train and supervise theory, it must be "mindful of the Supreme Court's warning that '[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'"  *Waller*, 932 F.3d at 1287 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) ("The causation element is applied with especial rigor when . . . the municipal liability claim is based upon inadequate training [and] supervision.").

> [F]or claims of inadequate hiring, training, or other supervisory practices, a plaintiff must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action, as [a] less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities.

*Waller*, 932 F.3d at 1284 (internal citations and quotation marks omitted).

12

"In the context of a 'failure to train' claim under § 1983, even a showing of gross negligence by the municipality is inadequate to meet the state-of-mind requirement." *Blueberry v. Comanche Cnty. Facilities Auth.*, 672 F. App'x 814, 817 (10th Cir. 2016) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 & n.7 (1989)).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct.

*Waller*, 932 F.3d at 1284 (internal citations and quotation marks omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 1285. Deliberate indifference may be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction. *Id.*

Here, though Plaintiff concludes that Defendant "Turn Key knew or should have known that the policies, practices and/or customs posed substantial risks to the health and safety of detainees," (Doc 26, at 17), he does not provide any <u>facts</u> demonstrating that Defendant Turn Key was deliberately indifferent in its alleged failure to train or supervise employees. In his Second Amended Complaint, Plaintiff points to no pre-existing pattern of tortious conduct that has violated the constitutional rights of others that would put Defendant Turn Key on notice of the need to train or supervise. Without such notice, there can be no conscious disregard. Plaintiff also fails to allege facts to establish that Defendant

Turn Key exhibited deliberate indifference through failing to train or supervise employees despite the risk of a constitutional violation being so highly predictable or plainly obvious as to constitute notice. As discussed above, since the court is ruling on a Rule 12(b)(6) motion, it cannot consider allegations in Plaintiff's Response to Defendant Turn Key's Motion to Dismiss (Doc. 38) regarding other alleged incidences of mistreatment at the hands of Turn Key employees.

Since Plaintiff failed to allege facts demonstrating that Defendant Turn Key had notice that its training or supervision was deficient, he has not plausibly alleged that Defendant Turn Key was deliberately indifferent. Therefore, Plaintiff has failed to state a municipal liability claim against Defendant Turn Key through a failure to train and supervise theory.

Plaintiff's failure to plausibly allege a policy is sufficient grounds for dismissal of the § 1983 claims against Defendant Turn Key. However, even if Plaintiff had succeeded in alleging a policy, Plaintiff has also failed to plausibly allege the underlying constitutional violation by Defendant Turn Key, as explained below.

### B. Plaintiff Has Failed to Allege Sufficient Facts to Demonstrate a Constitutional Violation by Turn Key Employees.

Fundamental to pursuing a § 1983 claim is a plausible allegation that the prisoner has suffered a violation of her constitutional rights. A claim by a pre-trial detainee that prison officials denied her medical attention arises under the Fourteenth Amendment, although the relevant analysis is the two-part inquiry of the Eighth Amendment, applicable to convicted inmates. *Quintana v. Santa Fe Cnty. Bd. of Comm'rs.*, 973 F.3d 1022, 1028

14

(10th Cir. 2020); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "A claim for inadequate medical attention will be successful if the plaintiff shows 'deliberate indifference to serious medical needs.'" *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). This exercise requires both an objective and a subjective inquiry.

> The objective inquiry asks whether the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment. The subjective inquiry, in turn, asks whether the defendants knew [the detainee] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.

*Quintana*, 973 F.3d at 1028-29 (internal citations and quotation marks omitted).

### 1.    Objective inquiry

"[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Quintana*, 973 F.3d at 1029 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). "[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely the symptoms presented at the time the prison employee has contact with the prisoner." *Martinez*, 563 F.3d at 1088. In Plaintiff's case, the alleged harm suffered by Ms. Hendrix – "an enormous black, bulging wound to her perineum, lower abdomen, buttocks and genitals," infected with flesh-eating bacteria, that ultimately caused her death, (Doc. 26, at 40-41) – is sufficiently serious to meet the objective criteria. Defendant Turn Key does not attempt to argue otherwise. (*See* Doc. 30, at 7-9).

### 2.    Subjective inquiry

In *Quintana*, the Tenth Circuit explained:

With respect to the subjective component of our Eighth Amendment inquiry, we begin by noting the Supreme Court has insisted upon actual knowledge: the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  It is true a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  But our precedent effectively cabins this exception by requiring that such risks present themselves as "obvious" to the so-called "reasonable man."

973 F.3d at 1029 (internal citations and quotation marks omitted).

The Second Amended Complaint alleges that:

21.    Beginning sometime in the first week of October 2020, *i.e.*, on or near October 4, 2020, Hendrix developed a rash on her legs. She reported this rash to Turn Key and/or Jail personnel. Nothing was done to address this condition.

22.    On or near October 4, 2020 (approximately one week before her death), Hendrix told both Gallagher and Yelton during visits that she was not feeling well. She told them she was experiencing nausea, severe pain, dizziness and vomiting.

23.    Hendrix requested to see medical staff either from Turn Key and/or Jail officers employed at the jail. This included Hendrix speaking to the medications nurse who delivered Hendrix's anxiety and mental illness medications.

24.    Hendrix was denied any evaluation or treatment for the rash she had developed when she complained.

25.    The Turn Key records indicate it provided no medical services or treatments to Hendrix in the month preceding her death.

26.    Hendrix was told by Turn Key and/or Jail officers that the only way she could receive treatment would be to make an appointment at the computer kiosk. These people would not permit her to make an appointment orally.

27.   The appointment kiosk Hendrix was instructed to use to schedule an appointment was broken. No other means of scheduling an appointment were given to her by Turn Key and/or Jail officers.

28.   During the time that the medications were passed, Hendrix informed the RN and a tech that the kiosk was broken and that she needed medical care.

29.   Hendrix pleaded with a Jailer about getting an appointment to see a physician. This Jailer told Hendrix he would provide her a written request form for medical treatment, but never did so.

30.   Turn Key made no effort to reach out to evaluate Hendrix despite its employees – nurses and/or other purported medical providers — knowledge of her preliminary and later advanced symptoms of serious medical need.

31.   On October 10, 2020, Hendrix had a video visit with Yelton. Hendrix was incoherent, had difficulty standing, and was acting erratically. Hendrix told Yelton that she felt like she "was dying."

32.   On that same date, Gallagher had a video conference with Hendrix. Gallagher observed that Hendrix looked very ill, including looking very pale and having black circles and bags under her eyes. Hendrix had difficulty standing up and would often lean against a wall or fall to the floor.

. . .

37.   On October 11, 2020, it appears Hendrix collapsed and was found "down".  It was only then that Turn Key and/or the Jail arranged for Hendrix to be transported to the hospital. This despite Jail and Turn Key employees would have observed Hendrix every day, while she was pale, incoherent, having difficulty standing, and otherwise in grave distress.

(Doc. 26, at 5-7).

Significantly, Plaintiff does not allege that Ms. Hendrix told anyone – neither a Turn Key employee, CCDC employee, nor her husband or mother – that she had "an enormous black, bulging wound to her perineum, lower abdomen, buttocks and genitals" that

17

"smelled as if she had defacated herself." (*Id*. at 7).  This was discovered by medical staff at the hospital.  (*Id*.)  Instead, Plaintiff alleges that eight days before her death Ms. Hendrix reported a "rash" on her legs to Turn Key and/or CCDC personnel; that she didn't receive evaluation or treatment for the rash; and that she both requested to see medical staff and to have access to means to schedule a medical appointment.  Reporting a rash and requesting a medical appointment – whether a general request or a specific request to treat a rash – is not sufficient to confer actual knowledge or to permit an inference of actual knowledge through an obvious risk of serious harm.  Indeed, the serious harm suffered by Ms. Hendrix would not be obvious to a reasonable person from these reported symptoms or requests.

The court must accept as true Plaintiff's allegation that "Turn Key employees would have observed Hendrix every day, while she was pale, incoherent, [and] having difficulty standing," (Doc. 26, at 7), as well as "acting erratically" and "look[ing] very ill, including looking very pale and having black circles and bags under her eyes," (*id*. at 6).  The court likewise draws the inference that Ms. Hendrix reported to Turn Key employees the same symptoms she reported to Plaintiff and her mother – "that she was not feeling well" and "was experiencing nausea, severe pain, dizziness and vomiting."  (*Id*. at 5).  While her appearance and symptoms could reasonably convey that Ms. Hendrix was suffering from an illness or perhaps fever, it would not be obvious to a reasonable person that Ms. Hendrix was experiencing a "substantial risk of serious harm," even when combined with her reports of a rash and requests for medical care.  *See e.g., Quintana*, 973 F.3d at 1029-30 (observing that unconsciousness, a gangrenous hand, a serious laceration, and bloody vomiting present an obvious risk, while frequent vomiting, appearing "severely ill," and

exhibiting common signs of heroin withdrawal or intoxication do <u>not</u> present an obvious risk).[3]  There are simply no facts alleged to suggest that anyone at CCDC was aware Ms. Hendrix had a wound, much less an infected, necrotic wound.  Thus, because Plaintiff has not plausibly alleged that any Turn Key employee had actual knowledge of facts from which he or she could draw an inference that there was a substantial risk of serious harm to Ms. Hendrix, much less that the employee consciously disregarded the risk, Plaintiff has failed to plausibly allege a constitutional violation to support any municipal liability claim against Defendant Turn Key.

## IV.  Plaintiff's Claims Against Defendants John Does 1-10 Should Be Dismissed.

Against Defendant John Does 1-10, Plaintiff alleges a claim of deliberate indifference to Ms. Hendrix's medical needs, a substantive due process claim, two claims under the Oklahoma Constitution, and state tort claims of gross negligence and intentional infliction of emotional distress.  (Doc. 26, at 9-15).  None of the John Doe defendants have been identified beyond Plaintiff's statement in the Second Amended Complaint that "[u]pon information and belief, at all times relevant the Defendant John Does 1-10 [] were employees, agents, and representative[s] of either the Sheriff's Office or Turn Key, are believed to be residents of Canadian County and were acting under color of state law." (*Id.* at 3).  Additionally, Plaintiff alleges no specific facts against any particular John Doe defendant.

---

[3] Plaintiff admits that when Ms. Hendrix was found "collapsed" and "down" (presumably unconscious) – *i.e.*, demonstrating an obvious risk – Turn Key or jail employees had Ms. Hendrix transported to the hospital.  (Doc. 26, at 7).

Plaintiff's broad allegations against jail and medical staff do not sufficiently demonstrate personal participation by each separate John Doe defendant in causing harm to Ms. Hendrix. Thus, Plaintiff has failed to state a claim against Defendant John Does 1-10, and such claims should be dismissed. *See Nasious v. Two Unknown B.I.C.E. Agents, at Arapahoe Cnty. Just. Ctr.*, 492 F.3d 1158, 1163 (10th Cir. 2007) (*dicta*) ("[T]o state a claim in federal court, a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated."); *see also Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established.").

## V.     Plaintiff's Substantive Due Process Claim Should Be Dismissed.

Plaintiff's Second Cause of Action is a substantive due process claim against all Defendants under the Fourteenth Amendment based on essentially the same factual allegations about deliberate indifference to Ms. Hendrix's serious medical needs as asserted in the First Cause of Action. (Doc. 26, at 11-13). The Supreme Court has explained that "'[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Court further explained,

> *Graham* "does not hold that all constitutional claims relating to physically
> abusive government conduct must arise under either the Fourth or Eighth
> Amendments; rather, *Graham* simply requires that if a constitutional claim
> is covered by a specific constitutional provision, such as the Fourth or Eighth
> Amendment, the claim must be analyzed under the standard appropriate to
> that specific provision, not under the rubric of substantive due process."

*Id.* at 843 (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)); *see also Riddle*

*v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (reviewing plaintiff's claims for denial

of medical care in prison under the Eighth Amendment and not as substantive due process

claims because "where constitutional protection is afforded under specific constitutional

provisions, alleged violations of the protection should be analyzed under those provisions

and not under the more generalized provisions of substantive due process").

Substantive due process analysis is therefore inappropriate in this case because

Plaintiff's claim based on deliberate indifference to serious medical needs is clearly

"covered by" the Eighth Amendment, as discussed above.  Accordingly, Plaintiff's Second

Cause of Action asserting a separate Fourteenth Amendment substantive due process claim

based on the same deliberate indifference claims should be dismissed against all

Defendants for failure to state a claim.[4]

---

[4] Unlike co-Defendants Carter and Sheriff West, Defendant Turn Key did not specifically
request dismissal of the Second Cause of Action on this basis.  However, the Court may
review the Second Amended Complaint and *sua sponte* dismiss claims under Rule 12(b)(6)
if it is patently obvious that the Plaintiff has not alleged facts sufficient to state a claim for
relief, and no amendment could cure the failure.  *See McKinney v. Okla. Dep't of Hum.
Servs.*, 925 F.2d 363, 365 (10th Cir. 1991); *see also Phillips v. Public Serv. Co. of N.M.*,
58 F. App'x 407, 409 (10th Cir. 2003).

**VI.     The Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claims Against Defendant Turn Key Because the Law Is Unsettled.**

Plaintiff alleges claims against Defendant Turn Key under both the Oklahoma constitution and state common law.  (Doc. 26, at 14-15).  Federal courts may exercise supplemental jurisdiction over state law claims that are intertwined with the claims over which the court has original jurisdiction.  *Est. of Harshman v. Jackson Hole Mountain Resort Corp*., 379 F.3d 1161, 1164 (10th Cir. 2004); 28 U.S.C. § 1367(a).  However, under 28 U.S.C. § 1367(c)(1), a federal district court may decline to exercise supplemental jurisdiction over a state law claim if it "raises a novel or complex issue of State law."  *See also Patel v. Hall*, 849 F.3d 970, 988 (10th Cir. 2017) ("On remand, the district court should first reconsider whether it should decline to exercise pendent jurisdiction over the state law claims . . . in light of the limited nature of the sole remaining federal claim in this action and the arguable existence of some unsettled questions of state law."); *Wallin v. Dycus*, 224 F. App'x 734, 740 (10th Cir. 2007), *as amended nunc pro tunc* (Mar. 5, 2008) (affirming the district court's declining to exercise supplemental jurisdiction over state law claims when the case "raise[d] issues that have not yet been explicitly addressed by the [state] courts").

As explained below, both of Defendant Turn Key's arguments against Plaintiff's state law claims — that Turn Key is immune from state tort claims and that no state constitutional claim for denial of adequate medical care exists — rely on unsettled state law.  Thus, the undersigned recommends the court decline to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendant Turn Key.

## A.      Immunity Under the OGTCA

Defendant Turn Key requests dismissal of Plaintiff's state law claims because it contends it is immune from liability under the Oklahoma Governmental Tort Claims Act ("OGTCA").  (Doc. 30, at 4-7).  However, Oklahoma law is unsettled as to whether a private contractor that provides medical services to inmates is immune from suit under the OGTCA.

The OGTCA provides that "[t]he state, its political subdivisions, and all of their employees acting within the scope of their employment . . . shall be immune from liability for torts."  Okla. Stat. tit. 51, § 152.1(A).  As defined in the OGTCA, a "tort" is "a legal wrong, independent of contract, involving violation of a duty imposed by general law, statute, the Constitution of the State of Oklahoma, or otherwise, resulting in a loss to any person . . . as the proximate result of an act or omission of a political subdivision or the state or an employee acting within the scope of employment."  Okla. Stat. tit. 51, § 152(14); *see also Barrios v. Haskell Cnty. Pub. Facilities Auth*., 432 P.3d 233, 238 (Okla. 2018) (explaining that the Oklahoma Legislature amended the OGTCA in 2014 "to specify that the State's immunity from suit extended even to torts arising from alleged deprivations of constitutional rights").

It is specifically provided that "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . [p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility."  Okla. Stat. tit. 51, § 155(25).  The Oklahoma Supreme Court has explained that the state and its political subdivisions cannot be held liable

> for any loss or injury, whether to an inmate or other person, resulting from the operational level acts required to furnish the services of a penal institution, including . . . the food, clothing, items for hygiene and other basic personal items needed by inmates or other persons; the educational, rehabilitative, communicational, recreational and medical and health services or any other service provided for inmates or other persons . . . ."

*Medina v. State*, 871 P.2d 1379, 1384 n.13 (Okla. 1993).

The Tenth Circuit has previously held that it is premature for a federal district court to determine whether a private corporation contracting to provide medical services to inmates, such as Defendant Turn Key, is immune from tort liability as a state or political subdivision "employee" under the OGTCA at the motion to dismiss stage. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1148 (10th Cir. 2023). The *Lucas* court stated that "without further guidance from the Oklahoma courts," it is appropriate to determine the immunity issue "at the summary judgment stage if the factual record is sufficiently developed and the facts are uncontroverted." *Id.*; *see also Bonilla v. Gerlach*, No. CIV 23-1060-R, 2024 WL 457172, at *5 (W.D. Okla. Feb. 6, 2024) (declining to dismiss state law claims against Turn Key at the motion to dismiss stage).

Since *Lucas*, the Oklahoma Court of Civil Appeals ("COCA") has decided two relevant cases with conflicting holdings. On February 27, 2024, the COCA affirmed a trial court's determination that Armor Correctional Health Services, Inc. ("Armor"), a private contractor that provides medical services to Oklahoma County Jail inmates, is immune under the OGTCA from torts arising from its provision of services. *Martin v. Bd. of Cnty. Comm'rs*, COCA Case No. 120,422, at 8-9 (Okla. Civ. App. Feb. 27, 2024). The *Martin* court explained that Armor was an "employee" covered by OGTCA immunity since the

24

OGTCA extended immunity to "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." *Id.* (quoting Okla. Stat. tit. 51, § 152(7)(b)(7)).  The *Martin* court also relied on Oklahoma Supreme Court case *Barrios v. Haskell County Public Facilities Authority*, in which the court considered whether the OGTCA protects State entities from constitutional torts.  432 P.3d 233.  The *Martin* court quoted a *Barrios* footnote that stated, "generally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." *Martin*, No. 120,422, at 9 (quoting *Barrios*, 432 P.3d at 236 n.5).

Conversely, on March 1, 2024, the COCA held in another case that "private corporate entities that contract with the state or a political subdivision to provide medical care to inmates or detainees of law enforcement agencies are not employees under title 51 O.S. § 152(b)(7) and are not immune from liability for their torts under the Oklahoma Governmental Tort Claims Act."  *Estate of Sanders v. Turn Key Health Clinics, LLC*, COCA Case No. 121,589, at 2 (Okla. Civ. App. March 1, 2024).  The COCA explained that while the OGTCA grants immunity to "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees," Okla. Stat. tit. 51, § 152(7)(b)(7), this immunity only extends to licensed *individuals*, not private corporate entities such as Turn Key.  *Estate of Sanders*, No. 121,589, at 7-8.  The *Sanders* court also cited *Barrios*, noting that the *Barrios* court stated in a footnote, "We have not been asked whether Turn Key Health, LLC or its staff are 'employees' under section

152(7)(b), but have assumed they are for purposes of answering the questions certified to us." *Id.* at 6 (quoting *Barrios*, 432 P.3d at 236 n.5).  The *Sanders* court explained that "[t]he assumption in *Barrios* is not precedent."  *Id.* at 6.

In light of the disagreement within the COCA on whether private entities that contract to provide medical care to inmates are entitled to tort immunity under the OGTCA, the undersigned recommends that the court decline to exercise supplemental jurisdiction over Plaintiff's state constitutional and common law claims against Defendant Turn Key. *See RX Med. LLC v. Melton*, No. CIV-22-731-PRW, 2022 WL 4000712, at *3 (W.D. Okla. Sept. 1, 2022) (declining supplemental jurisdiction over state law issues "revolving around the interpretation of an important state statute" and "over which the parties suggest that panels of the state's intermediate appellate court may disagree").

### B.      State Constitutional Claims

Regarding Plaintiff's state constitutional claims, Defendant Turn Key also argues that "no cause of action for denial of medical care exists under Article II, Sections 7 or 9 of the Oklahoma Constitution." (Doc. 30, at 4 (citing *Barrios*, 432 P.3d at 241)).  However, Oklahoma law is unsettled as to whether a private cause of action based on a state constitutional violation exists when an entity does not have immunity under the OGTCA.

In *Barrios*, the Oklahoma Supreme Court considered the following certified question:

> The Governmental Tort Claims Act renders the State immune from any tort suit arising out of the "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility."  Do Sections 7 and 9 of Article II of the Oklahoma Constitution nonetheless allow an inmate to bring a tort claim for denial of medical care?

432 P.3d at 235.  The *Barrios* court held that the OGTCA clearly immunized the State from constitutional torts, including constitutional torts arising from Article II, Sections 7 and 9 of the Oklahoma Constitution.  *Id.* at 238-39.  In *dicta*, the *Barrios* court stated, "[e]ven if not barred by sovereign immunity, [] it is doubtful that such claims would exist in the Oklahoma common law.  Certainly nothing in the text of Article II, Sections 7 and 9 creates a tort cause of action for money damages as a remedy to vindicate violations of those rights . . . ."  *Id.* at 239.  The decision also noted that the Oklahoma Supreme Court has "never squarely held" that a claim for damages pursuant to Article II, Section 9 exists.  *Id.*

Two years later, in *Payne v. Kerns*, the Oklahoma Supreme Court considered whether a prisoner who was detained beyond the expiration of his sentence had a private cause of action under Article II, Section 9 of the Oklahoma Constitution when his claim accrued prior to the OGTCA granting the State immunity from constitutional torts.  467 P.3d 659, 665-66 (Okla. 2020).  The *Payne* court stated, "[s]ince 2002, this Court has recognized the potential for a private right of action for violations of Okla. Const. art. 2, § 9.  We hold a private right of action [] exists for detention beyond the expiration of one's sentence under this section."  *Id.* at 666.  *Payne*'s holding suggests that, absent immunity, a State or municipal entity may be subject to a state constitutional tort claim for the denial of adequate medical care.  *See id.*; *see also Washington v. Barry*, 55 P.3d 1036, 1039 (Okla. 2002) ("A prisoner in a penal institution has no right to recover for the use of excessive force by prison employees <u>unless</u> the force applied was so excessive that it violated the prisoner's right to be protected from the infliction of 'cruel or unusual punishments' under

the state and federal constitutions.") (emphasis added).

Since it is unclear whether Defendant Turn Key is granted immunity under the OGTCA, a claim for Ms. Hendrix's denial of adequate medical care may exist under Article II, Sections 7 and 9 of the Oklahoma Constitution. However, in light of the tension between *Barrios* and *Payne*, this Court is not in a position to state definitively whether such a cause of action exists under Oklahoma law. *See* 28 U.S.C. 1367(c)(1).

On several occasions this court has declined to exercise supplemental jurisdiction over state law claims involving constitutional torts due to their complex and novel nature. *See, e.g.*, *Blankenship v. Stitt*, No. CIV-22-00958-PRW, 2024 WL 733654, at *7 (W.D. Okla. Feb. 22, 2024); *Poff v. Oklahoma Dep't of Hum. Servs.*, No. CIV-15-936-R, 2017 WL 2468978, at *3 (W.D. Okla. June 7, 2017); *Daffern v. Rhodes*, No. CIV-16-1025-C, 2016 WL 7429454, at *3 (W.D. Okla. Dec. 23, 2016). Thus, even if it were determined that Defendant Turn Key is not immune from tort claims under the OGTCA, this court should still decline to exercise supplemental jurisdiction over Plaintiff's state constitutional claims against Defendant Turn Key.

## VII.   Recommended Ruling and Notice of Right to Object

For the reasons discussed above, the undersigned recommends that Defendant Turn Key's Motion to Dismiss (Doc. 30) be **GRANTED** and that all of Plaintiff's claims against Defendant Turn Key be **DISMISSED** without prejudice.

**The undersigned advises the parties of their right to file an objection to this Report and Recommendation with the Clerk of Court on or before April 1, 2024,** under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned further advises

the parties that failure to file a timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation does not terminate the referral in this matter.

ENTERED 18th day of March, 2024.


AMANDA MAXFIELD GREEN
UNITED STATES MAGISTRATE JUDGE